**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> FRANCISCO ALBERTO DIAZ-ESPANA, ) <br> ) <br> Defendant. ) <br> _____ ) | Case No. 2:09-cr-00127-LDG-PAL <br><br> **REPORT OF FINDINGS AND RECOMMENDATION** <br><br> (Mtn to Dismiss - Dkt. #25) |

This matter is before the court on Defendant Francisco Alberto Diaz-Espana's ("Diaz") Motion to Dismiss Based Upon Claim of Derivative Citizenship (Dkt. #25) filed August 27, 2009. The government filed a Response (Dkt. #26) on September 3, 2009, and Diaz filed a Reply (Dkt. #27) on September 9, 2009. The court has considered the Motion, the Response, and the Reply.

**BACKGROUND**

Diaz is charged by way of a criminal Indictment (Dkt. #1) returned March 25, 2009, with one count of Unlawful Reentry of a Deported Alien in violation of 8 U.S.C. § 1326. The indictment charges that Garcia was deported and removed from the United States on or about March 8, 2000, and on or about May 5, 2005, he unlawfully reentered and remained without the express consent of the Attorney General or his successor, the Secretary for Homeland Security under 6 U.S.C. §§ 202(3) & (4) and 6 U.S.C. § 557. In the current motion, Diaz seeks dismissal of the indictment on the grounds that he has a meritorious derivative citizenship claim.

**I.   Statement of Facts**

Diaz was born on May 8, 1973 in Mexicali, Baja California, Mexico. See Declaration of Adela Espana, attached to the Motion to Dismiss as Exhibit A at ¶ 12. At the time of Diaz's birth, his mother, Ms. Espana, was a citizen of the United States by virtue of her birth in Brownsville, Texas. Id. at ¶ 3.

1   When Ms. Espana was thirteen, she met Diaz's father, Francisco Alberto Diaz-Luna ("Diaz Senior"),
2   who was twenty-three. Id. at ¶ 9. The two began a romantic relationship, condoned by Ms. Espana's
3   family, and Ms. Espana became pregnant with Diaz. Id. at ¶ 10-11. As a result of the couple's age
4   difference, the two feared prosecution by American law enforcement and left the United States to live in
5   Mexicali, Baja California, Mexico to live with Diaz Senior's relative. Id. at ¶ 11.

6   Diaz was born on May 8, 1973 in Mexico. Id. at ¶ 12. Ms. Espana suffered complications
7   during Diaz's birth, and her kidneys were damaged. Id. at ¶ 13. She was told that if the kidney
8   infection was not treated, she would require dialysis for the rest of her life. Id. Because Ms. Espana
9   was so young and in poor health, her sister, Bertha Diaz, came to Mexico to help Ms. Espana travel
10  back to the United States. Id. at 15. Bertha Diaz and Ms. Espana entered the United States at the Port
11  of Entry at Calixico, California. Id. at 16. Ms. Espana was questioned by Border Patrol, and she
12  explained that she was an American citizen and that she had given birth to her son in Mexico. Id. at 17.
13  She presented her birth certificate, school identification card from California, and medical records
14  verifying her medical condition and Diaz's birth. Id.

15  Border Patrol admitted them into the United States and told Ms. Espana that she should take her
16  son to the Immigration and Naturalization Services ("INS") so that he could be permitted to remain in
17  the United States. Id. at 18. After receiving treatment for her kidney infection, Ms. Espana presented
18  her son to INS in Las Vegas, Nevada to verify his immigration status. Id. at 20. Diaz Senior
19  accompanied them. Id. Ms. Espana explained that she wanted her son to live with her in the United
20  States and become a U.S. citizen. Id. at 22. The INS officer explained to her that if she married Diaz
21  Senior, he would obtain lawful permanent residency. Id. The INS officer also explained Ms. Espana
22  would need to file the same form for both Diaz Senior and her son, but he failed to inform her that she
23  would need to file an additional form (immigration form N-600) in order for Diaz to become a citizen.
24  Id.

25  On June 27, 1974, Ms. Espana filed two Petitions to Classify Status of Alien Relative for
26  Issuance of Immigrant Visa–one for Diaz and one for Diaz Senior. Id. at 24. After the petitions were
27  approved, Espana, Diaz, and Diaz Senior traveled to Mexico to finalize the immigration processing.
28  Id. at 25. On May 11, 1976, Espana, Diaz, and Diaz Senior re-entered the United States with the

1  immigrant visas issued to them.  Id. at 25; see also Exhibit B to Motion.  Diaz and his father were
2  admitted to the United States as lawful permanent residents and issued alien registration cards or "green
3  cards."  See Attachment to government's Opposition at 14-17.  On August 25, 1976, Ms. Espana
4  applied for a replacement card for her son at the Las Vegas INS office, claiming it had been lost.  Id. at
5  13-14.  A replacement card was issued and sent by mail on March 16, 1977.  Id. at 18-19.

6        Diaz has been convicted of several criminal offenses in Clark County, Nevada, including felony
7  possession of a controlled substance, felony grand larceny auto, gross misdemeanor possession of stolen
8  vehicle and attempted theft, and various misdemeanor offenses for battery domestic violence, petty
9  larceny, and disorderly conduct.  See Attachment to government's Response at 1-4.  Diaz does not
10 dispute that after becoming an adult he "sustained a conviction which later rendered him removable."
11 Motion at 5:11-12.  Diaz has been deported on two prior occasions–on March 8, 2000 and May 5, 2005.
12 Additionally, on December 4, 2003, Diaz was convicted of Unlawful Reentry of Deported Alien in the
13 District of Nevada and was sentenced to thirty months in the Bureau of Prisons.  See id. at 5-10. The
14 Indictment alleges that on or about November 10, 2008, Diaz re-entered and remained in the United
15 States without lawful permission.  See Dkt. #1.

16 **II.    The Parties' Positions**

17       Diaz asserts that he cannot be prosecuted under 8 U.S.C. § 1326 because he has a meritorious
18 derivative citizenship claim, and he is a citizen, not an alien.  He argues that he derives his citizenship
19 from his mother, who is an American citizen by virtue of her birth in Brownsville, Texas.  Relying upon
20 section 322 of the Immigration and Naturalization Act (the "INA"), codified at 8 U.S.C. § 1433(a),
21 Diaz argues that he has fulfilled all three prerequisites to obtain citizenship.  First, his mother is a
22 citizen of the United States.  Second, he was admitted for lawful residence in September 1976 after he
23 and his father finished the last stages of obtaining their immigrant visas.  Last, Diaz argues that
24 although his mother never filed the appropriate form for his citizenship, the government is estopped
25 from denying him citizenship based upon the erroneous advice given to Ms. Espana by immigration
26 authorities.  Relying on United States v. Tallmadge, 829 F.2d 767, 776 (9th Cir. 1987), Diaz alleges
27 that the government is estopped from denying he is a citizen because the INS officer was authorized to
28 ///

interpret the statute conferring citizenship, his statements affirmatively misled Ms. Espana, and she reasonably relied on the INS officer's statements.

In response, the government argues that Diaz cannot establish derivative citizenship under 8 U.S.C. § 1433(a) because he did not satisfy one of the three requirements of 8 U.S.C. § 1433, and the record does not support a finding of affirmative government misconduct. The government also contends that it is not estopped from denying Diaz's claim of derivative citizenship because estoppel cannot be used to confer citizenship when the statutory requirements for citizenship are not met. The government argues that INS officials did not give Ms. Espana misinformation or erroneous advice. The government also disputes that INS officials either purposefully or negligently failed to inform her of the requirements of INA § 322 and the need to petition for Diaz's citizenship before he turned eighteen. Assuming arguendo the immigration officer failed to inform her of all the requirements, this failure does not amount to affirmative misconduct to support an estoppel defense. Finally, the government contends it is unreasonable to believe Ms. Espana thought she had done everything necessary to secure citizenship for her son because she was aware her son was receiving an immigration visa and lawful permanent resident document. Additionally, her application for a replacement green card in August 1976 demonstrates she knew her son was a lawful permanent resident and not a citizen of the United States.

In reply, Diaz argues that he is not requesting that the court declare him a citizen. Rather, he seeks to estop the government from claiming he is an alien for purposes of proving the illegal reentry charge detailed in the Indictment. Diaz also asserts that the record shows that INS officials denied him citizenship through affirmative misconduct by misleading Ms. Espana about what she needed to do to confer citizenship on her son. Diaz contends his failure to become a citizen is "due solely to the INS officers' failure to provide complete advice" and that the government cannot prove the alienage element of this offense.

## DISCUSSION

**A.    Motion to Dismiss Standard of Review**

A motion to dismiss challenges the sufficiency of an indictment to charge an offense. United States v. Sampson, 371 U.S. 75, 78-79 (1962). "An indictment is sufficient if it contains the elements

of the charged crime and adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." United States v. Buckley, 689 F.2d 893, 896 (9th Cir. 1982). In determining the sufficiency of the indictment, the court examines whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, and not whether the government can prove its case. Id. at 897. In deciding a motion to dismiss, the court must take the allegations of the indictment as true. Boyce Motor Lines, Inc., v. United States, 342 U.S. 337, 343 n.16 (1952); United States v. Afshari, 426 F.3d 1150, 1153 (9th Cir. 2005). An indictment need not allege the government's theory of the case or supporting evidence, but it must state the essential facts necessary to apprise the defendant of the crime charged. Id.

Rule 12 of the Federal Rules of Criminal Procedure requires a defendant to challenge a defective indictment prior to trial. See Fed. R. Crim. P. 12(b)(3)(A) & (B). Rule 12(b)(2) permits a party to raise "any defense, objection, or request that the court can determine without a trial of the general issue." Id. A pretrial motion is generally "capable of determination" before trial if it involves questions of law rather than fact. United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986). The trial court may make preliminary findings of fact necessary to decide the legal questions presented by the motion, but it may not invade the province of the jury in deciding a pretrial motion to dismiss. It is also well-established that "[a] motion to dismiss is not a proper way to raise a defense." United States v. Snyder, 428 F.2d 520, 522 (9th Cir. 1970).

The Indictment alleges that Diaz violated 18 U.S.C. § 1326. The essential elements for this offense require the government to prove that (a) Diaz is an alien; (b) who has been denied admission, excluded, deported, or removed; and (c) thereafter attempted to reenter or was found in the United States without permission of the Attorney General or his successor. Id. The Indictment alleges the essential elements of the crime of unlawful reentry and fairly informs the defendant of the charge. The motion to dismiss asserts the government cannot prove an essential element of the offense – that he is an alien – because the government is estopped from denying Diaz is a citizen. The court finds that this is an affirmative defense that may not be decided as a matter of law in a motion to dismiss because it involves mixed questions of fact and law.

/ / /

**B.     Diaz's Estoppel Defense**

The defense of entrapment by estoppel is a due process defense first applied by the Supreme Court in Raley v. Ohio, 360 U.S. 423 (1959). In Raley, the Supreme Court reversed the convictions of three of four defendants convicted of contempt for failing to answer questions as witnesses before the Un-American Activities Commission of the State of Ohio. Because the Chairman of the Commission, who clearly appeared to be the agent of the State, advised the defendants they had a privilege to refuse to answer, the Supreme Court held that it would violate the Due Process Clause of the Fourteenth Amendment to convict a citizen for "exercising a privilege which the State clearly had told him was available to him." Id. at 438. The Supreme Court characterized such a conviction as "the most indefensible sort of entrapment." Id.

The Ninth Circuit has applied the defense of entrapment by estoppel in several cases. In United States v. Lansing, 424 F.2d 225, 227 (9th Cir. 1970), the court declined to define the precise scope of a misleading government conduct defense but found that "more is required than a simple showing that the defendant was as a subjective matter misled, and the crime resulted from his mistaken belief." Id. The court held that to establish the defense of official misleading, the defendant must establish "that his reliance on the misleading information was reasonable – in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." Id.

In United States v. Timmins, 464 F.2d 385, 386-87 (9th Cir. 1972), the Ninth Circuit applied the defense of official misleading to the conduct of a local draft board. The defendant was convicted for refusing to submit to induction into the Armed Forces. He claimed to be a conscientious objector and asked for the form to claim this exemption. He was sent a form which referred to religious training and believed that because he did not have formal religious training, he could not claim conscientious objector status with this form and requested the "moral form not the religious training one." Id. Testimony was admitted at trial that when the defendant requested the "new" conscientious objector form and the "moral form," he was under the impression, based on newspaper articles, that there had been a change in the law which permitted moral beliefs to be considered for conscientious objector status. These newspaper articles were reports of a Supreme Court decision that held that persons whose

opposition to war was based on moral or ethical beliefs could qualify as conscientious objectors. The Court of Appeals held that the defendant must show that he relied on the false information and that his reliance was reasonable, concluded that the local board misled him into believing that formal religious training was a prerequisite to a valid claim of conscientious objection, and reversed the conviction. Id. at 387.

In United States v. Hsieh Hui Mei Chen, 754 F.2d 817 (9th Cir.), cert. denied, 471 U.S. 1139 (1985), the Ninth Circuit held that the defendants were not entitled to an instruction on entrapment in a prosecution for bribery and aiding and abetting another to commit bribery. In upholding the district court's decision refusing to instruct the jury regarding entrapment by estoppel, the Ninth Circuit described the defense as follows: "Entrapment by estoppel applies when an official tells the defendant that certain conduct is legal[,] and the defendant believes the official." Id. at 825.

Diaz' motion to dismiss relies on Tallmadge, 829 F.2d 767, to support his estoppel arguments. In Tallmadge, the Ninth Circuit reversed the convictions of a defendant after a bench trial of multiple counts of receipt and possession of a firearm in violation of 18 U.S.C. § 922(h)(1) and 18 U.S.C. § 1202(a)(1). Tallmadge had been previously convicted of a state felony offense punishable by more than one year which was later expunged and reduced to a misdemeanor. The government's case was submitted to the district court on a stipulated set of facts. Tallmadge stipulated that he purchased and received the rifles described in the indictment and that he answered "no" to questions on an ATF firearms transaction record which asked if he had been convicted of a crime punishable by imprisonment for more than one year. The parties also stipulated that Tallmadge was convicted of a felony offense, advised by the state trial judge on the date of his sentencing that he was convicted of a felony, and that his conviction was "expunged and reduced to a misdemeanor." The parties further stipulated that the expunction order did not release Tallmadge of his obligation to disclose the prior conviction in response to a direct question or application for public office or licensure. Tallmadge and his criminal defense lawyer testified that Tallmadge was told by a federally-licensed gun dealer that he could purchase a rifle because his state charge had been reduced to a misdemeanor. The trial court found their testimony credible but rejected the state of mind due process defense on the grounds that *scienter* was not a defense to the crimes.

In reversing the convictions, the Ninth Circuit held that the trial court did not properly consider the due process defense of entrapment by estoppel. Finding that the United States government had made licensed firearms dealers federal agents for purposes of gathering and dispensing information on the purchase of firearms, the Ninth Circuit held that Tallmadge had the right to rely on representations made by a licensed firearms dealer that he could purchase firearms after his state conviction had been reduced to a misdemeanor. Tallmadge also sought and obtained advice from an experienced criminal defense attorney regarding his right to possess a nonconcealable firearm. His attorney advised him that he could possess a "long gun." Under these circumstances, the Ninth Circuit held:

> The prosecution and conviction of Tallmadge for the receipt and possession of firearms, after he was misled by the government agent who sold him the weapons into believing that his conduct would not be contrary to federal law, violated due process.

Id. at 775.

In this case, Diaz does not claim that he was misled or relied on any misleading information supplied by INS. Rather, he claims that his mother was misled. The parties dispute whether officials of the INS provided Diaz's mother with false or misleading advice on which she reasonably relied. Thus, this is not a matter which can be decided as a matter of law in a motion to dismiss. See, e.g., United States v. Evans, 928 F.2d 858, 860 (9th Cir. 1991), abrogated on other grounds, U.S. v. Edwards, 55 F.3d 428 (9th Cir. 1995) (finding in a prosecution for making false statements to the Bureau of Alcohol, Tobacco and Firearms, a jury question exists concerning whether the actions taken by government officials misled the defendant into reasonably believing his actions were not unlawful in support of an estoppel by an entrapment defense); see also United States v. Hsieh Hui Mei Chen, 754 F.2d at 821 (stating "In order to show that entrapment exists as a matter of law, there must be undisputed testimony making it patently clear that an otherwise innocent person was induced to commit the act complained of by trickery, persuasion, or fraud of a government agent. The controlling question on review is whether the defendant lacks the predisposition to commit the act") (citations omitted), cert. denied, 471 U.S. 1139 (1985).

Neither side has cited a case in which the doctrine of estoppel by entrapment was applied to a § 1326 prosecution. The government cites a number of immigration cases in which the Supreme Court and the Ninth Circuit have held in other contexts that courts may not apply equitable remedies,

including the doctrine of estoppel, to challenge decisions made by immigration officials pursuant to statutory authority. Diaz responds that these cases are not applicable to this criminal case because he is not challenging any decision made by INS regarding his citizenship status. Rather, he is seeking to prevent the government in this criminal prosecution from claiming he is an alien by applying the doctrine of estoppel.

Diaz acknowledges that there are only two sources of citizenship–birth and naturalization. It is undisputed that Diaz was born in Mexico. It is undisputed that Diaz had a statutory right to derivative citizenship because his mother was an American citizen when he was born abroad. Finally, it is also undisputed that the statute in effect at the time of his birth, INA § 322, codified at 8 U.S.C. § 1433, provided that a child born outside the United States could derive citizenship if: (1) one or both parents were a citizen of the United States; (2) the child was under the age of eighteen at the time the petition was filed; and (3) the child was lawfully admitted into the country. Although Diaz was eligible for citizenship as a child of a U.S. citizen born abroad, his petition for citizenship was not made before he turned eighteen. Diaz concedes that his mother did not apply for citizenship. He asserts she did not do so because she believed she had followed all of the instructions given to her by immigration authorities and that she was not advised of the requirements of 8 U.S.C. § 1433.

It is well-established that the normal estoppel rules applicable to private litigants do not apply to decisions made by immigration authorities in enforcing acts of Congress governing naturalization. This is because Congress has the exclusive constitutional power to enact laws determining the requirements for naturalization, and in deciding petitions for naturalization, the agency is enforcing public policy established by Congress. INS v. Hibi, 414 U.S. 5 (1973). In INS v. Pangilinan, 486 U.S. 875, 883-84, (1988), the Supreme Court again held that the federal courts lack the authority to craft equitable remedies to confer citizenship because that power has not been conferred upon the federal courts. Article 1, Section 8, cl. 4, of the Constitution confers upon Congress the exclusive power "[t]o establish a uniform Rule of Naturalization . . ." Acts of Congress establishing rules for citizenship must be enforced, and courts "are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." Id. at 884 (citing United States v. Ginsberg, 243 U.S. 472 (1917)).

In <u>Pangilinan</u>, several Filipino veterans of World War II sought American citizenship under an expired statute enacted to reward Filipino veterans for their service. 486 U.S. at 877. The veterans argued that their failure to seek citizenship in a timely manner should be excused because the Attorney General unlawfully revoked authority to grant citizenship petitions prior to the expiration of the statute, thus depriving qualifying individuals from obtaining citizenship. <u>See id.</u> at 885. The Supreme Court found that courts cannot employ equitable remedies to confer citizenship where the statutory requirements for citizenship were not satisfied. <u>Id.</u> Thus, "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." <u>Id.</u>

Diaz recognizes that the court has no authority to confer citizenship and responds that he is not asking for this relief. Rather, he is asking that the government be equitably estopped from denying his citizenship (or claiming that he is an alien) because immigration officials misled his mother. The government asserts he is effectively requesting the same type of relief. The government relies on the Ninth Circuit's decision in <u>Mustanich v. Mukasey</u>, 518 F.3d 1084 (9th Cir. 2008), to support its position. <u>Mustanich</u> involved an appeal by a lawful permanent resident of a final order of removal by the Board of Immigration Appeals ("BIA"). Mustanich was convicted of burglary and ordered removed as an aggravated felon. He sought to terminate his removal proceedings on the ground he was a United States citizen, arguing that although he did not file an application for naturalization prior to the applicable statutory deadline, the government's own affirmative misconduct precluded him from timely filing. The Ninth Circuit rejected this argument, citing <u>Pangilinan</u> for the proposition "that citizenship cannot be conferred by estoppel where the statutory requirements for naturalization have not been satisfied." <u>Id.</u> at 1085.

Mustanich claimed that his father made several unsuccessful attempts to submit a timely application for naturalization on his behalf and repeatedly requested guidance on how to obtain citizenship for his son. He argued that the United States' repeated failure to provide instructions on how to file a naturalization application amounted to affirmative misconduct that estopped the government from denying him citizenship. The Ninth Circuit found that it was bound by <u>Pangilinan</u> and held that the government was not estopped from denying citizenship. It reasoned that "Congress

plainly requires that an individual born abroad apply for naturalization prior to his or her eighteenth birthday." Id. at 1088. Mustanich conceded that he did not file his application before his eighteenth birthday. The Ninth Circuit found that under these circumstances, estoppel "would amount to precisely the type of equity-based departure from the requirements of the immigration statutes that Pangilinan prohibits." Id.

Mustanich then argued that Pangilinan did not apply because he was not seeking to use the doctrine of estoppel to confer citizenship, but rather to preclude the United States from denying his application for citizenship. The Ninth Circuit saw "no meaningful difference." Id. It found that estopping the Attorney General from denying Mustanich's application would "resolve the remaining hurdle in his favor and compel issuance of a certificate of citizenship." Id. at 1089. The court went on to find that "[t]he rule in Pangilinan cannot be avoided where the immediate and necessary consequence of the requested equitable relief is the conferral of citizenship." Id. (citing Miller v. Albright, 523 U.S. 420, 455 (1998) (Scalia, J., concurring)). The court, therefore, held:

> ...that Mustanich's removal proceedings cannot be terminated on the ground that he is a citizen. Estoppel cannot confer citizenship because not all of the requirements of 8 U.S.C. § 1433(a) have been satisfied. Because estoppel is unavailable, we do not reach the question of whether the traditional requirements for that remedy have been met.

Id. at 1089-90.

As indicated, none of the cases cited by the parties involves application of the doctrine of estoppel to a Section 1326 prosecution. However, the court can see no meaningful difference between the estoppel arguments made in Mustanich and those raised by Diaz in this case. "It is well-established that the Government is not in a position identical to that of a private litigant with respect to its enforcement of laws enacted by Congress." Hibi, 414 U.S. at 8. The immediate and necessary consequence of estopping the government from denying Diaz is a citizen would arguably confer citizenship. The court need not decide whether entrapment by estoppel is an available affirmative defense because that issue is not before the court. Diaz seeks to dismiss the indictment, and a motion to dismiss is not the proper vehicle to raise a defense.

/ / /

/ / /

Based upon the foregoing,

**IT IS RECOMMENDED** that the Motion to Dismiss Based Upon a Claim of Derivative Citizenship (Dkt. #27) be DENIED.

Dated this 19th day of October, 2009.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE